LARRY HAYNES,     :
           :
     Plaintiff,  :
           :
   v.       :    Civil Action No. 16-2086 (CKK)
           :
DC WATER IS LIFE,    :
           :
     Defendant. :

## MEMORANDUM OPINION

Plaintiff Larry Haynes brings this action against his former employer, the District of Columbia Water and Sewer Authority ("DC Water"), under the Americans with Disabilities Act ("ADA"), *see* 42 U.S.C. 12101 *et seq.* (Count I), Title VII of the Civil Rights Act of 1964 ("Title VII"), *see* 42 U.S.C. § 2000e *et seq.* (Count II), 42 U.S.C. § 1981 ("Section 1981") (Count III), the Age Discrimination in Employment Act ("ADEA"), *see* 29 U.S.C. § 623 *et seq.* (Count IV), and the District of Columbia Human Rights Act ("DCHRA"), *see* D.C. Code § 2-1401 *et seq.* (Count V). He also brings a breach of contract claim (Count VI). Plaintiff demands declaratory and injunctive relief, compensatory and punitive damages, litigation expenses and reasonable attorney's fees.

This matter is before the Court on Defendant District of Columbia Water and Sewer Authority's Motion for Summary Judgment, ECF No. 18. For the reasons discussed below, the Court concludes that plaintiff's claims under the ADA and the DCHRA are time-barred, that plaintiff failed to exhaust his age and race discrimination claims under the ADEA and Title VII,

that DC Water did not violate Section 1981 by purposely discriminating against plaintiff on the basis of his race, and that plaintiff fails to state a breach of contract claim. Accordingly, the Court will grant DC Water's motion in its entirety.

## I. BACKGROUND

Plaintiff is a 55-year old African American man, Pl.'s First Am. Compl., ECF No. 17 ("Am. Compl.") ¶ 4, who is dyslexic, *see id*. ¶ 9. DC Water "is an independent authority of the District of Columbia that provides retail water and wastewater sewer service to the District of Columbia." *Id*. ¶ 5. Its predecessor entity, the District of Columbia Department of Public Works, Water and Sewer Administration, hired plaintiff in 1988 as an Electrical Equipment Repairer 11/CDL. *Id*. ¶ 6.

An Electrical Equipment Repairer 11/CDL "perform[ed] a wide range of electrical duties independently under the supervision of an electrical foreman." Def. District of Columbia Water and Sewer Auth.'s Mem. of P. & A. in Support of its Mot. for Summ. J., ECF No. 18-1 ("Def.'s Mem."), Decl. of Charles Sweeney in Support of Def. District of Columbia Water and Sewer Auth.'s Mot. for Summ. J., ECF No. 18-3 ("Sweeney Decl.") ¶ 8.[1] Each person in this position

---

[1] Plaintiff deems Mr. Sweeney's declaration inadmissible hearsay evidence which the Court should not consider. *See, e.g.,* Statement of Disputed Material Facts in Support of Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 21-1 ¶¶ 4-7. The Court disagrees. A "declaration used to support . . . a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Mr. Sweeney is the Director of Distribution and Conveyance Systems at DC Water, Sweeney Decl. ¶ 2, and was involved with the planning an execution of the reorganization and consolidation of the Departments of Sewer, Water and Sewer Pump Maintenance into a single Department of Distribution and Conveyance Systems, *id*. ¶ 4. These are the circumstances under which plaintiff's claims arose, about which Mr. Sweeney has personal knowledge and about which Mr. Sweeney is competent to testify. DC Water "is not required to produce evidence in a *form* that would be admissible at trial" at the summary judgment stage, as long as "the evidence [is] capable of being converted into admissible evidence." *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C.

was "only required to hold an apprentice electrician's license and a Commercial Driver's License [(CDL)]." Sweeney Decl. ¶ 8; *see id*., Ex. 1 (Job Description, Electrical Equipment Repairer 11/CDL) at 2. "Throughout his employment with DC Water, [plaintiff] had an [a]pprentice [e]lectrician['s] license and a Class B [CDL.]" Am. Compl. ¶ 6.

In or about 2011, DC Water planned to reorganize and consolidate its "Department of Water, Department of Sewer, and the Water and Sewer Pump Maintenance Branch into one department called the Department of Distribution and Conveyance Systems." Sweeney Decl. ¶ 4. Management identified positions to abolish and identified "new positions . . . to create to replace the abolished positions and/or meet new organizational requirements." *Id*. ¶ 6. One of the positions slated for abolishment was the Electrical Equipment Repairer 11/CDL position. *Id*. ¶ 7. DC Water announced the reorganization in 2014. *Id*.

It came to light during the reorganization process that District of Columbia licensure requirements for electricians required direct supervision over "employees holding only an apprentice electrician's license [by] a person holding a master electrician's license[.]" *Id*. ¶ 9. DC Water sought guidance from the District of Columbia Department of Consumer and Regulatory Affairs, *see id*., which advised:

> Pursuant to District law, "[a]n apprentice electrician shall work only under the direct personal supervision and control of a licensed master electrician or licensed master electrician specialist." *See D.C. Official Code §47-2853.92(a) (2010 Repl.)*. Accordingly, an apprentice electrician employed by [DC Water] must be directly supervised, which means that a qualified individual must be present

_____

Cir. 2000) (emphasis in original). The Court is satisfied that the statements set forth in Mr. Sweeney's declaration are capable of being converted into admissible, non-hearsay evidence if he were to testify at trial. *See Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*, 72 F. Supp. 3d 121, 129 n.9 (D.D.C. 2014) (finding that declarant's "statements . . . are capable of being converted into admissible, non-hearsay, evidence when he testifies at trial, as [plaintiff] has indicated that [the declarant] will do.").

> to observe and guide the work of an apprentice. Further, District law specifies that a master electrician or master electrician specialist must provide the necessary supervision. Therefore, a licensed journeyman electrician cannot supervise an apprentice. Thus, to comply with District law, any Electrical Foreman or General Foreman employed by [DC Water who] supervises the performance of electrical work must be licensed as a master electrician or master electrician specialist, as only a licensed master is legally authorized to assume responsible charge over the performance of electrical work in the District.

*Id.*, Ex. 2 (Letter to Stephanie Black, Manager, Learning and Development, DC Water, from Pamela Hall, Program Support Specialist, D.C. Board of Industrial Trades, Occupational and Professional Licensing Division, Department of Consumer and Regulatory Affairs, dated March 18, 2015) at 2-3 (emphasis in original).

"DC Water did not employ a sufficient number of master electricians to directly supervise the electricians with apprentice electrician['s] licenses." *Id.* ¶ 10. Management determined that, "[g]iven the financial and practical objectives of the planned reorganization, it was not practical or reasonable for DC Water to hire additional master electricians to individually oversee each Electrical Equipment Repairer 11/CDL." *Id.* Instead, DC Water "change[d] the minimum license qualifications for the Electrical Equipment Repairer 11/CDL position, and create[d] the Industrial Journeyman Electrician position to replace it." *Id.* ¶ 11. Each Industrial Journeyman Electrician was required to have a journeyman electrician's license and a CDL. *Id.* ¶ 12; *see id.*, Ex. 3 (Job Description, Industrial Journeyman Electrician) at 2.

American Federation of Government Employees Local 2553 ("Union") represented employees in the Electrical Equipment Repairer 11/CDL positions. *See id.* ¶ 13.[2] Pursuant to

---

[2]  Mr. Sweeney's declaration identifies the union as AFL-CIO Local 2553. Sweeney Decl. ¶¶ 13-14. The exhibits to his declaration identify the union as the American Federation of Government Employees Local 2553. *See id.*, Ex. 8 (Memorandum of Agreement Regarding the Department of Distribution and Conveyance Systems) & Ex. 10 (Working Conditions Agreement Between DC Water and American Federation of Government Employees Local

the collective bargaining agreement ("CBA"), DC Water notified the Union of its "decision that Electrical Equipment Repairer 11 employees needed a journeyman[] electrician['s] license" by hand-delivering a letter to the Union's president on July 11, 2014. *Id.* ¶ 14. In addition, DC Water outlined the reorganization in a PowerPoint presentation to Union representatives on that same date. *Id.* ¶ 15. "[T]he Union requested effects bargaining on July 16, 2014, *id.* ¶ 16, and bargaining began on or about August 26, 2014, *id.* ¶ 18.[3] "Among the topics discussed was the requirement that . . . Electrical Equipment Repairer 11/CDL employees obtain a journeyman electrician's license to qualify for the new position" of Industrial Journeyman Electrician. *Id.*

The Union and DC Water disagreed about the length of time within which an Electrical Equipment Repairer 11/CDL was to obtain a journeyman electrician's license. The Union proposed that an "employee[] holding an apprentice electrician's license be permitted a total of four (4) years to obtain [a] journeyman electrician's license." *Id.* ¶ 19. DC Water rejected this proposed timeframe because the journeyman electrician's license requirement was a legal requirement. *Id.* Ultimately DC Water and the Union entered into a Memorandum of Agreement ("MOA"), and with respect to the Electrical Equipment Repairer 11 positions, the parties agreed:

> Current DC Water bargaining unit employees[] in the position of Electrical Equipment Repairer possessing a DC Apprentice Electrician['s] license selected for Industrial Journeyman Electrician and Industrial Specialist Electrician positions shall have until March 31, 2015 to acquire the required DC Journeyman Electrician['s] license. Beginning September 2, 2014, any

---

2553). The Court presumes that the correct union is American Federation of Government Employees Local 2553.

[3] In the interim, the Union requested "additional information about the potential effects of the reorganization on the Union's members," and DC Water responded in writing. Sweeney Decl. ¶ 17; *see id.*, Ex. 6 (Letter to Mustaafa Dozier, Manager, Labor Relations and Compliance, DC Water, from Barbara B. Hutchinson dated July 16, 2014) and Ex. 7 (Letter to Barbara B. Hutchinson from Clifford Mustaafa Dozier, Esq., dated July 18, 2014).

> bargaining unit member in possession of a DC Apprentice license may participate in training for and testing for the DC Journeyman Electrician['s] license. DC Water shall pay for this training. Employees are expected to test within thirty (30) calendar days of completing this training. Employees that fail the test may retest so long as the second test is taken by March 31, 2015.

*Id.*, Ex. 8 (Memorandum of Agreement Regarding the Department of Distribution and Conveyance Systems dated September 2, 2014) ¶ 4.

The MOA also included agreements with respect to other DC Water employees affected by the reorganization. For example:

> For any AFGE Local 2553 bargaining unit employee in the position of Utility Systems Operator RW-08, hired into the position of a Utility Systems Operator I or II, the employee shall have 18 months to obtain the required certification. Any training shall be paid for by DC Water. If any employee fails a test at any point during the eighteen (18) month period [he] shall be allowed to retest at DC Water's expense, so long as the retest occurs prior to the conclusion of the eighteen (18) month period . . . . Provided the employee has obtained the certification in [his] area of prior work experience (Distribution or Collections), employees who do not meet a certification requirement because the testing authority determines the employee did not perform the requisite number of years of work in the classification, shall be provided the time needed to meet the classification requirement.

*Id.*, Ex. 8 ¶ 3.

Notwithstanding the MOA, in October 2014, "the Union initiated an unfair labor practice grievance under the procedures laid out in Article 58 of the [CBA]." *Id.* ¶ 23; *see generally id.*, Ex. 10 (Working Conditions Agreement Between DC Water and American Federation of Government Employees Local 2553) at 81-87 (Art. 58, General Grievance and Arbitration Procedures). The grievance did not delay implementation of the reorganization in November 2014. *Id.* ¶ 24.

"In the fall of 2014, [plaintiff] was informed that his job title was being changed to Industrial Journeyman Electrician and that [an] Industrial Journeymen Electrician[ was] required

to obtain a [j]ourneyman [e]electrican['s l]icense." Am. Compl. ¶ 7.  On October 3, 2014, DC Water proffered a copy of the job description for the Industrial Journeyman Electrician position, Sweeney Decl. ¶ 25, and plaintiff refused to sign a form acknowledging its receipt, *see id.*, Ex. 9 (Job Description Transmittal).  Plaintiff had only six months to obtain a journeyman electrician's license, even though "[t]he license generally requires years of coursework and the signature of a master electrician who supervised the candidate." Am. Compl. ¶ 8.

Pursuant to the MOA, DC Water provided training for employees converting to the new Industrial Journeyman Electrician positions.  Sweeney Decl. ¶¶ 26-27.  Plaintiff began the course in September 2014. *Id.* ¶ 26.  According to DC Water, plaintiff took a 15-week course ending in December, 2014. *Id.* ¶ 28.  According to plaintiff, DC Water provided a six-week course at the end of which he "received a certificate showing that he completed sixty hours of training for the Journeyman Electrician Examination."  Am. Compl. ¶ 8.  However, he "did not believe the course sufficiently prepared him for the examination," in part because "the course instructor admitted that [the] course was designed as a refresher for people who had already passed the test previously, and it was not meant for first-time test takers." *Id.*

"In the fall of 2014, [plaintiff] told various members of human resources . . . that he is dyslexic and needed additional time and to go to class if DC Water wanted him to obtain a [journeyman electrician's] license." *Id.* ¶ 9.  "They refused to give him the additional time," *id.*, even though "other DC Water electricians, including Caucasian and younger electricians," were given 18 months to two years to obtain their licenses, and "some were even allowed to go back to school, *id.* ¶ 10.  For example, according to plaintiff, there were employees "in the machine shop division [who] were not subject to the new [j]ourneyman [e]electrician['s] license requirement[.]" *Id.*  Plaintiff "tried to obtain a doctor's medical certification to show that he is

dyslexic," but he was not able to do so until May 13, 2015. *Id.* ¶ 11; *see generally* Mem. of P. &

A. in Opp'n to Def.'s Mot. for Summ. J., ECF No. 21 ("Pl.'s Opp'n") Ex. E (Clinical

Neuropsychological Evaluation dated May 13, 2015).[4]

Meanwhile, the Union's grievance proceeded. "The parties could not agree on a

statement of issues to be decided by the Arbitrator." Def.'s Mem., Ex. 14 (Arbitration Decision

dated July 12, 2015) at 2. On "[c]onsider[ation of] the evidence presented and the arguments in

the briefs," *id.*, Ex. 14 at 20, the Arbitrator fashioned his own statement of four issues to be

decided, two of which are relevant here:

> Did [DC Water] violate the MOA or Articles 4 or 18 of the [CBA]
> when it required Electrical Equipment Repairer . . . 11s to convert
> to the job classifications of Industrial Journeyman Electrician and
> Industrial Specialist Electrician and to obtain a CDL and
> journeyman electrician['s] license?

> Did [DC Water] violate Article 34, Section A of the [CBA] when
> the MOA required Industrial Journeyman Electricians and Industrial
> Specialist Electricians to obtain new licenses by March [31], 2015?

*Id.*, Ex. 14 at 21.[5] The Arbitrator found that DC Water did not violate any of the relevant CBA

or MOA provisions, and denied the grievance. *Id.*, Ex. 14 at 40. The Arbitrator's decision in DC

Water's favor was binding on both parties. *Id.*, Ex. 10 at 86 (Art. 58, Sec. 1, para. 12).

---

[4] Plaintiff claims to have told human resources personnel that he has dyslexia, yet he fails to
identify the person(s) he notified, indicate whether or to whom he delivered the medical
certification, or identify the person(s) to whom he directed his request(s) for accommodation.
Plaintiff points to no materials in the record to show that DC Water actually knew he has
dyslexia, and he cannot establish this fact on summary judgment by relying on the allegations of
his Amended Complaint. *See* Statement of Disputed Material Facts in Support of Pl.'s Opp'n to
Def.'s Mot. for Summ. J. ¶¶ 20-22, 24 (citing Am. Compl. ¶ 17). He has cited no evidence in the
record to support this claim. In addition, there is no evidence in the record that the Dr.
Olarinde's report with the diagnosis of dyslexia ever was provided to DC Water.

[5] In relevant part, Article 4 provides that DC Water "shall give the President of the Union
advance written notice of changes in personnel policies, practices, or working conditions
affecting employees covered by this Agreement." Sweeney Decl., Ex. 10 at 2 (Art. 4, Sec. B,
para. 2). Article 18 pertains to the release of information. *See id.*, Ex. 10 (Table of Contents).

There were seven incumbent Electrical Equipment Repairer 11/CDL employees eligible for the newly-created Industrial Journey Electrician positions: six are African-American and one is Caucasian. Sweeney Decl. ¶ 29. Two of the African-American employees already had journeyman electrician's licenses. *Id.* One African-American employee and the Caucasian employee "successfully tested for, and obtained, a journeyman electrician's license." *Id.* Plaintiff and the two remaining African-American employees did not obtain a journeyman electrician's license by the March 31, 2015 deadline. *Id.* ¶ 30. In April 2015, plaintiff "submitted his application for the Journeyman Electrician license exam, and was authorized to take the exam on June 1, 2015." Am. Compl. ¶ 12.

On April 1, 2015, Charles Sweeney, Director of Distribution and Conveyance Systems, Sweeney Decl. ¶ 3, sent plaintiff a letter "informing him of his failure to meet the licensure requirement to convert to the Industrial Journeyman Electrician position" by the March 31, 2015 deadline, *id.* ¶ 30; *see id.*, Ex. 12 (Letter to plaintiff from Charles Sweeney dated April 1, 2015). DC Water declined to terminate plaintiff's employment at that time. *Id.* ¶ 31. Instead, "DC Water removed him from his position as an electrician on April 1, 2015," Am. Compl. ¶ 12, and allowed him (and the two other African-American employees who failed to meet the March 31, 2015 deadline) an additional 60 days, to May 31, 2015, to obtain a journeyman electrician's license, Sweeney Decl. ¶¶ 31-32; *see id.*, Ex. 12 (Acknowledgment of Receipt of Sixty (60) day Notice to Obtain a Journeyman Electrician['s] License). Plaintiff and two other African-Americans "were the only Electrical Equipment Repairer 11 employees provided additional time

_____

Article 34 pertains to employee licenses and certifications. If DC Water finds that "employees holding certain positions should be certified or licensed, [it] agrees to assure that all employees who are employed in such positions . . . shall be trained and otherwise assisted in satisfying this requirement." *Id.*, Ex. 10 at 42 (Art. 34, Sec. A).

to obtain the required license." *Id.* ¶ 32.  Still, plaintiff failed to obtain the license, and DC

Water terminated his employment effective May 31, 2015.  *Id.* ¶ 34; *see id.*, Ex. 13 (Personnel

Action Report).  He "received no benefits as part of the reduction-in-force (RIF) or severance

package from the termination," and he was not eligible for rehire, *see* Sweeney Decl., Ex. 13, as

were other DC Water employees, Am. Compl. ¶ 12.

"On May 26, 2015, [plaintiff] went to the Washington Field Office of the Equal

Employment Opportunity Commission [EEOC]," where he filed a charge of discrimination,

completed an intake report, and signed an agreement to mediate his discrimination charges.  *Id.* ¶

13.  To indicate the basis of discrimination, plaintiff only checked the box marked

"DISABILITY."  *See* Pl.'s Opp'n, Ex. A (Charge of Discrimination dated May 26, 2015).  He

stated that the alleged discrimination took place between April 1, 2015 and May 26, 2015, and

involved "CONTINUING ACTION."  *Id.*, Ex. A.  The narrative section of the charge read:

> I work as an Electrical Equipment Repair[er] 11/CDL for the DC
> Water and Sewer Authority . . . .  I have a disability and require
> reasonable accommodations.    I have documentation that
> demonstrates that I am disabled and require reasonable
> accommodations.
>
> I require a reasonable accommodation so that I can obtain the
> training for the . . .  the Journeyman Electrician['s] License.  My
> Employer has not provided me with reasonable accommodations for
> the training required to obtain th[is] license[].  Because I have been
> unable to obtain th[is] license[] I have been laid off.
>
> I believe that my layoff (and possible subsequent termination as a
> result of being unable to obtain these licenses) was discriminatory
> in violation of the Americans with Disabilities Act of 1990, as
> amended[] ("ADA")[,] and that my Employer has failed to provide[]
> me with a reasonable accommodation in violation of the ADA.

*Id.*, Ex. A.

The EEOC "issued a Notice of Right to Sue on May 27, 2015."  Am. Compl. ¶ 13.  It

advised plaintiff that, if he chose to file a lawsuit, the must do so within 90 days of his receipt of

the notice. *See* Pl.'s Opp'n, Ex. H (Dismissal and Notice of Rights dated May 27, 2015).

Proceeding *pro se*, plaintiff filed his original complaint, ECF No. 1, on September 29, 2016.[6] He

subsequently retained counsel who filed an amended complaint, ECF No. 17, on his behalf.

## II. DISCUSSION

### A. Summary Judgment Standard

DC Water moves for summary judgment under Rule 56 of the Federal Rules of Civil

Procedure. "The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R .Civ. P. 56(a). A party asserting that a fact cannot be or is genuinely disputed must

support the assertion by "citing to particular parts of materials in the record, including

depositions, documents . . . affidavits or declarations, stipulations . . . , admissions, [or]

interrogatory answers[, or by] showing that the materials cited do not establish the absence or

presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

support the fact." Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of

fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the

court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When considering a motion for summary judgment, the Court cannot make credibility

determinations or weigh the evidence; the evidence must be analyzed in the light most favorable

---

[6] It is the practice of the Clerk of Court to date stamp each pleading upon receipt. Review of the docket reveals that the Clerk of Court received plaintiff's original complaint, ECF No. 1, and his application to proceed *in forma pauperis*, ECF No. 2, on September 29, 2016, that the Court granted plaintiff's application on October 14, 2016, and that the Clerk of Court officially filed both documents on CM/ECF on October 20, 2016. The Court treats the original complaint as if it had been filed on September 29, 2016.

to the nonmoving party, with all justifiable inferences drawn in his favor. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986). "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted). The mere existence of a factual dispute does not bar summary judgment, however. *See Liberty Lobby*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. The adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he cannot rely on conclusory assertions without any factual basis in the record to create a genuine dispute, *see Ass'n of Flight Attendants - CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).

### *B. ADA Claim (Count I)*

DC Water moves for summary judgment on Count I of the Amended Complaint on the ground that plaintiff's ADA claim is time-barred. Def.'s Mem. at 7. The Notice of Right to Sue includes a warning that any lawsuit was to be filed within 90 days of the claimant's receipt of the notice. *See* Pl.'s Opp'n, Ex. H. DC Water contends that plaintiff filed his lawsuit "nearly seventeen (17) months *after* he received his Notice of Right to Sue, and approximately fourteen (14) months *after* the expiration of [his] deadline to initiate his ADA suit." Def.'s Mem. at 8 (emphasis in original).

The Amended Complaint does not specify the date on which plaintiff received the Notice of Right to Sue. However, he does not deny DC Water's assertions that he received the notice on May 27, 2015, that he had until August 25, 2015 to file a lawsuit under the ADA, and that he filed his original complaint on September 29, 2016. *See* Def.'s Statement of Undisputed Facts in

12

Support of its Mot. for Summ. J., ECF No. 18-2 ("Def.'s SOF") ¶¶ 28, 30-31; Statement of

Disputed Material Facts in Support of Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 21-1

("Pl.'s SOF") at 3 (page number designated by ECF) (omitting mention of Def.'s SOF ¶¶ 24-32).

He argues instead that the limitations period should be tolled.  *See* Pl.'s Opp'n at 12-13.  Plaintiff

has dyslexia, a learning disability, which he claims rendered him *non compos mentis* and thus

incapable of handling his affairs between May 30, 2015 and September 29, 2016.  *Id*. at 12; *see*

Pl.'s Opp'n to Def.'s Mot. to Dismiss, or in the Alternative, Mot. for Summ. J., or in the

Alternative, Mot. for a More Definite Statement, ECF No. 12, at 6-7.  For this reason, plaintiff

asserts, his lawsuit should be considered timely filed.

      Under District of Columbia law, "when a person entitled to maintain an action is, at the

time the right of action accrues . . .  non compos mentis . . . he or his proper representative may

bring action within the time limited after the disability is removed."  D.C. Code § 12-302(a).

Although the statute itself "does not itself define *non compos mentis*," *Smith-Haynie v. District*

*of Columbia*, 155 F.3d 575, 580 (D.C. Cir. 1998), "[t]he phrase . . . generally refers to someone

incapable of handling his own affairs or unable to function [in] society," *Hendel v. World Plan*

*Exec. Council*, 705 A.2d 656, 665 (D.C. 1997) (quoting *Speiser v. U.S. Dep't of Health &*

*Human Servs.*, 670 F. Supp. 380, 384 (D.D.C. 1986), *aff'd* , 818 F.2d 95 (D.C. Cir. 1987)).

      "The disability of a person claiming to be *non compos mentis* must be 'of such a nature as

to show [he] is unable to manage [his] business affairs or estate, or to comprehend [his] legal

rights or liabilities.'"  *Smith-Haynie*, 155 F.3d at 580 (quoting *Decker v. Fink*, 422 A.2d 389, 392

(Md. 1980)); *see also Oparaugo v. Watts*, 884 A.2d 63, 73 (D.C. 2005).  Impaired judgment by

itself does not excuse a plaintiff's untimely filing, *see Decker*, 422 A.2d at 393, and "[t]he mere

existence of mental problems or life difficulties will not suffice," *Davis v. Vilsack*, 880 F. Supp.

2d 156, 162 (D.D.C. 2012). Indicia of *non compos mentis* status might include a showing that plaintiff has been "adjudged incompetent, signed a power of attorney, had a guardian or caretaker appointed, or otherwise took measures to let someone else handle [his] affairs[.]" *Speiser*, 670 F. Supp. at 385.

Plaintiff relied on the reports of Emmanuel A. Olarinde, Ph.D., a licensed clinical psychologist, one of which was prepared prior to his termination. Plaintiff had "referred himself for a psychoeducational evaluation . . . designed to assess [his] cognitive ability [and] academic achievement in reading and mathematics." Pl.'s Opp'n, Ex. E-1 (Clinical Neuropsychological Evaluation dated May 13, 2015) at 1.[7] Dr. Olarinde observed:

> [Plaintiff] came to the testing sessions [on April 13, April 20, and April 27, 2015] well kept, and groomed. Hygiene was effectively managed and he dressed appropriately for the occasion . . . . Facial expression was responsive, and eye contact was appropriate. [Plaintiff] demonstrated normal activity level and he appeared not to be easily aroused by extraneous environmental stimuli . . . .
>
> [Plaintiff's] speech was spontaneous but with significant articulation problems. However[,] communication with the examiner was not impeded in any significant way either receptively or expressively. His thinking was assessed through his speech production. [Plaintiff's] though process was coherent, logical and goal directed. He was able to reach his goal of thoughts without significant digression. Thought content was devoid of delusion, phobia, obsession, suicide, homicide, preoccupied ideas, or any symptoms of psychosis . . . .
>
> Major components of his memory, such as, immediate, short-term and remote memories[,] appeared to be intact. [Plaintiff] did not exhibit significant attention and concentration problems. [He] was adequately oriented to time, place and person . . . . He complied with the examiner's guidelines and performed all the tasks and answered all the questions presented to him.

*Id.*, Ex. E-1 at 1-2.

---

[7] Plaintiff produces two evaluations, one dated May 13, 2015 and the other dated September 13, 2015. The Court designates the former "Ex. E-1" and the latter "Ex. E-2."

Subsequent testing with respect to plaintiff's intellectual ability revealed that plaintiff's "reasoning abilities on verbal tasks are generally in the low average range . . . while his nonverbal reasoning abilities are significantly higher and in the average range." *Id.*, Ex. E-2 (Clinical Neuropsychological Evaluation dated September 13, 2015) at 4. Further, Dr. Olarinde found that plaintiff's "ability to sustain attention, concentrate, and exert mental control is in the low average range," and his "ability in processing simple or routine visual material without making errors is in the average range." *Id.*, Ex. E-2 at 4.

Dr. Olarinde concluded that plaintiff would "have serious difficulties in learning and memory in any training that involves reading and writing." *Id.*, Ex. E-1 at 4. With respect to plaintiff's reading ability, Dr. Olarinde found "[a] relative weakness in decoding words as compared to reading words in isolation," which "may indicate that [plaintiff] has difficulty applying phonetic rules for decoding words but may not have learned vocabulary words to automaticity." *Id.*, Ex. E-1 at 2-3. He concluded that plaintiff "has a disorder of the basic psychological process involved in understanding or in using written language that manifest[s] itself in an imperfect ability to read[,] write and spell, or to do mathematical calculations, including conditions such as visual and auditory perceptual disabilities and dyslexia." *Id.*, Ex. E-1 at 4 (emphasis removed). Only after this second round of testing did Dr. Olarinde appear to diagnose a "[r]eading [d]isorder with impairment in word reading and reading comprehension (dyslexia)," recommending that plaintiff's employer "accommodate for his reading disabilities" by using "a device where instructions or test items or questions are read to him." *Id.*, Ex. E-2 at 6.

In addition, plaintiff pointed to errors he made as evidence of his inability to comprehend his legal rights. When he "attempted to complete the EEOC Charge of Discrimination form . . .

he selected the box that stated he does not have a disability and selected 'genetic information' as the type of discrimination he faced on the EEO questionnaire." Pl.'s Opp'n at 12; *see id*. Exs. A, F.  He also "stated that he faced a 'layoff' on April 1, 2015, because he did not understand DC Water's letter [to mean] that he needed to complete his license within sixty days." *Id*.; *see id*., Ex. C.  Further, he pointed to his misidentification of his former employer on his *pro se* complaint as "DC Water Is Life," and he even wrote down the incorrect zip code for his home address. *Id*.  And among other examples, plaintiff referred to the quality of his *pro se* complaint and DC Water's need to file a "motion for a more definite statement due to the limited facts presented and nonexistent legal allegation" as proof that he "was absolutely unable to manage his own legal affairs." *Id*. at 13.

Missing from plaintiff's opposition are any references to materials in the record of this case tending to show that plaintiff could not manage his own affairs or otherwise function in society because of a reading disorder.  Nothing is known about plaintiff's activities and mental or physical condition during this supposed period of incapacity.  Plaintiff does not claim that his judgment was impaired or that his physical or mental health was compromised.  He neither identifies an event that suddenly triggered his incapacity on May 30, 2015, nor explains how his incapacity was removed on September 29, 2016, the day he filed his original *pro se* complaint.

Rather, plaintiff's actions immediately prior to the purported onset of his *non compus mentis* status on May 30, 2015 reflect an understanding that his employment with DC Water was at risk unless he could obtain a journeyman electrician's license, that his dyslexia is a basis for requesting a reasonable accommodation to prepare for the licensure examination, that DC Water may have discriminated against him because of his disability, and that the EEOC was an appropriate place to seek relief.  Dr. Olarinde's observations, particularly his assessment that

plaintiff's "thought process was coherent, logical and goal directed," Pl.'s Opp'n, Ex. E-1 at 1, are not consistent with a person who purports to be incompetent or who was otherwise unable to manage his own affairs. Furthermore, the narrative set forth in plaintiff's EEOC charge was coherent and clearly set forth a claim of discrimination based on disability.

The Court concludes that plaintiff was not *non compos mentis*, that equitable tolling of the 90-day limitations period is not warranted, and that his ADA claim is untimely. Summary judgment will be granted in DC Water's favor on Count I.

### C. Title VII (Count II) and ADEA (Count IV) Claims

An employer shall not "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [.]" 42 U.S.C. § 2000e-2(a)(1). Nor shall an employer "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of [his] age." 29 U.S.C. § 623(a)(1).

A plaintiff bringing employment discrimination claims under Title VII and the ADEA first must file a charge of discrimination with the EEOC. *See* 42 U.S.C. § 2000e-5(b) (Title VII); 29 U.S.C. § 626(d) (ADEA). If the EEOC determines "that there is no reasonable cause to believe that the charge is true," the EEOC "shall dismiss the charge and promptly notify the person claiming to be aggrieved." *Id.* Only after a plaintiff files his charge of discrimination and obtains a notice of right to sue has he exhausted his administrative remedies on a race discrimination claim, *see, e.g., Bell v. Redding*, 539 F. Supp. 2d 423, 424 (D.D.C. 2008), and only then can he file a lawsuit in federal district court, *see, e.g., Jones v. District of Columbia*, 273 F. Supp. 2d 61, 64 (D.D.C. 2003). A plaintiff who is not a federal employee raising an age

discrimination claim must file a charge of discrimination with the EEOC, but he need not obtain a notice of right to sue before filing his lawsuit. *See Cruz-Packer v. District of Columbia*, 539 F. Supp. 2d 181, 189 (D.D.C. 2008). "These procedural requirements . . . are not trivial." *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 68 (D.D.C. 2007). They are designed to give "agencies an opportunity to handle matters internally whenever possible and to ensure that the federal courts are burdened only when reasonably necessary." *Id.* (citing *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985)) (internal quotation marks omitted).

Generally, the scope of the subsequent lawsuit "is limited . . . to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (citing *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)); *see Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (reinforcing *Park* holding insofar as claims in civil suit must arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination). "A plaintiff fails to exhaust [his] administrative remedies when the complaint [he] files in federal court includes a claim that was not raised in the administrative complaint." *Mogenhan v. Shinseki*, 630 F. Supp. 2d 56, 60 (D.D.C. 2009).

DC Water seeks judgment in its favor on Counts II and IV of the Amended Complaint on the ground that plaintiff failed to exhaust his administrative remedies with respect to his race and age discrimination claims before filing this lawsuit. *See* Def.'s Mem. at 8-10. It notes that plaintiff's charge of discrimination "contains neither a checked box for 'race' or 'age,' nor does the factual narrative include any reference to discrimination based on age or race, or to [plaintiff's] age or race." *Id.* at 9. Rather, "the checked boxes and factual narrative only include allegations of disability discrimination and failure to accommodate," such that "no reasonable

reading and/or interpretation of the Charge . . . allows the inference that [plaintiff] intended to bring claims of race and age discrimination, or even contemplated the existence of any such claims at the time of filing the Charge." *Id*. at 9-10.

Plaintiff argues that his failure to check the boxes for race and age discrimination is not dispositive. Rather, he contends that his race and age discrimination claims "would have arisen from an investigation of his charge of discrimination" based on his disability because all of his claims "arose from the same factual circumstances." Pl.'s Opp'n at 10. And, he asserts, his Intake Questionnaire indicates his intention to list the ages of certain employees whom DC Water treated more favorably than it treated plaintiff, *see id*., Ex. F (Intake Questionnaire) at 2, from which the EEOC was to divine an age discrimination claim. Similarly, he asserts that an investigation as to "timing concerns regarding the Journeyman license would give rise to [his] claims of race and age discrimination." *Id*. at 11. The Court is not persuaded.

A Title VII claim "must arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Park*, 71 F.3d at 907 (internal quotation marks and citation omitted). It simply is not reasonable to conclude that an investigation of the allegations in plaintiff's EEOC charge, particularly in light of its repeated mention of "disability" and "reasonable accommodation," would uncover a claim of discrimination based on race or age. *See Hicklin v. McDonald*, 110 F. Supp. 3d 16, 21 (D.D.C. 2015) (finding that plaintiff "failed to give any notice that he was alleging retaliation in his EEO complaint; rather, he clearly indicated race and religion as the only bases for the adverse action he suffered and furnished a narrative focusing solely on his allegedly hostile work environment without mentioning retaliation or reprisal"); *Massey v. Gray*, 85 F. Supp. 3d 104, 109 (D.D.C. 2015) (concluding that allegations of discrimination based on gender, race, disability and retaliation raised for the first time in

amended complaint "are neither like nor reasonably related to her age discrimination claim" in the charge of discrimination "and therefore are not properly before the Court"), *aff'd sub nom. Massey v. District of Columbia*, No. 15-7041, 2015 WL 9310126 (D.C. Cir. Dec. 9, 2015) (per curiam); *Brown v. District of Columbia*, 251 F. Supp. 2d 152, 162 (D.D.C. 2003) (finding that "plaintiff [who] checked only the boxes for allegations of discrimination based on race and disability, and did not check the boxes for gender discrimination or retaliation, and whose civil complaint "relate[d] specifically to race and disability discrimination [with] absolutely no indication that plaintiff was alleging gender discrimination or retaliation" failed to exhaust gender discrimination and retaliation claims).

All of plaintiff's discrimination claims may have arisen from the same factual circumstances: abolishing the Electrical Equipment Repairer 11/CDL positions, creating the Industrial Journeyman Electrician positions, and requiring a journeyman electrician's license by date certain. It is apparent, however, that plaintiff's "timing concerns" pertain to the time period within which he was expected to train for, take and pass the journeyman electrician's license examination, and the difficulty his reading disability may have posed. An EEOC investigation likely would have focused on the nature of plaintiff's purported disability and the reasonable accommodations he may have requested or to which he may have been entitled. It is not at all clear that inquiries of this nature would have uncovered a basis for race and age discrimination claims plaintiff himself had not raised.

The Court concludes that plaintiff failed to exhaust his administrative remedies with respect to his Title VII and ADEA claims, and grants summary judgment for DC Water on Counts II and IV.

## D. Section 1981 Claim (Count III)

"Section 1981 prohibits private employers from intentionally discriminating on the basis of race with respect to the 'benefits, privileges, terms, and conditions' of employment." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (per curiam) (quoting 42 U.S.C. § 1981) (additional citation omitted). "Under extant precedent[,] purposeful discrimination requires more than 'intent as volition or intent as awareness of consequences' . . . . It instead involves a decisionmaker's undertaking a course of action 'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009) (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)) (brackets in original). In other words, "only . . . purposeful discrimination" violates Section 1981. *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982).

Plaintiff alleges that DC Water discriminated against him on the basis of his race in violation of Section 1981 when it "changed his official position to require an unnecessary license, gave him six months to obtain the [j]ourneyman [e]lectrician['s l]icense while giving Caucasian electricians eighteen months to two years to obtain their . . . [l]icenses, denied [him] the chance to go back to school while offering Caucasian employees the opportunity to take classes and obtain the education necessary to earn their [j]ourneyman [e]lectrician['s l]icenses, removed him from his position, and terminated him from his employment." Am. Compl. ¶ 25.

"For purposes of summary judgment, the operative question under Section 1981 . . . is whether the employee produced sufficient evidence for a reasonable jury to find that . . . the employer intentionally discriminated against [him] on the basis of race." *Ayissi-Etoh*, 712 F.3d at 576 (quoting *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (internal quotation marks removed). Where a plaintiff presents no direct evidence of

discrimination, the Court employs the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973):

> Under this formula, a plaintiff must first establish a *prima facie* case of prohibited discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). The employer must then come forward with a legitimate, non-discriminatory reason for the challenged employment decision. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). If the employer meets this burden, the framework falls away and the court must decide one ultimate question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee[?]" *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

*DeJesus v. WP Co. LLC*, 841 F.3d 527, 532-33 (D.C. Cir. 2016).

However, it is well-established that "it is no longer relevant" if plaintiff established his prima facie case once defendant has proffered a non-discriminatory explanation for its conduct. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983). Here, because DC Water has proffered an allegedly non-discriminatory reason for its decision to terminate plaintiff, setting forth facts to establish a prima facie case would be "an unnecessary sideshow." *Brady*, 520 F.3d at 494. Thus, the Court need only determine whether plaintiff has "produced sufficient evidence for a reasonable jury to find the [defendant's] non-discriminatory reason was not the actual reason that [DC Water] intentionally discriminated against [plaintiff] on the basis of" his protected status. *Id*.

DC Water proffered that compliance with District of Columbia law prompted its actions. *See* Sweeney Decl. ¶¶ 8-11; *see id*., Ex. 2; Def.'s SOF ¶¶ 8-9. It "could not ignore that some of the Electrical Equipment Repairer 11s, including [plaintiff] might not be qualified electricians in the District of Columbia because they had apprentice electrician's licenses, worked independently for extended periods of time, and [did] not [work] under the direct supervision of

a master electrician." Def.'s Mem. at 12. Because there were not enough master electricians in DC Water's employ to supervise directly each Electrical Equipment Repairer 11 with only an apprentice electrician's license, and because DC Water lacked the resources to hire a sufficient number of master electricians, it opted to "chang[] the Electrical Equipment Repairer 11 position into the Industrial Journeyman Electrician position." *Id*. at 12-13. Each Electrical Equipment Repairer 11 – regardless of his race – was required to have, or to obtain by March 31, 2015, a journeyman electrician's license. *Id*. at 13; *see* Sweeney Decl. ¶¶ 20-21; Def.'s SOF ¶ 17. All of the then-incumbent Electrical Equipment Repairer 11s had the same deadline, and all had the same opportunity for training at DC Water's expense in preparation for the license examination. Def.'s Mem. at 13-14; *see* Sweeney Decl. ¶¶ 21-22; Def.'s SOF ¶¶ 18, 21. Plaintiff was allowed two additional months to comply with the licensure requirement, and still failed to do so. Sweeney Decl. ¶ 13; Def.'s SOF ¶¶ 25, 29. DC Water proffered that the imposition of a licensure requirement consistent with District of Columbia law was the legitimate nondiscriminatory reason for abolishing the Electrical Equipment Repairer 11 positions, creating the new Industrial Journeyman Electrician positions, and requiring each Journeyman Electrician to have a journeyman electrician's license. Def.'s Mem. at 12.

At this stage, plaintiff bears the burden to show that DC Water's proffered reason was not the actual reason for its employment decisions, and, instead, DC Water discriminated against plaintiff on the basis of his race. *See Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1151 (D.C. Cir. 2003). "One way to discredit an employer's justification is to show that similarly situated employees of a different race received more favorable treatment." *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 145 (D.C. Cir. 2008) (citing *Brady*, 520 F.3d at 495). "In order to successfully use similarly situated individuals to establish pretext and thus raise an

inference of discrimination, a plaintiff must establish that all of the relevant aspects of [his] employment situation were nearly identical to those of the comparators." *Steele v. Carter*, 192 F. Supp. 3d 151, 169 (D.D.C. 2016) (internal quotation marks and citation omitted), *aff'd in part, appeal denied in part sub nom. Steele v. Mattis*, No. 16-5236, 2017 WL 2332608 (D.C. Cir. Feb. 21, 2017).

The Amended Complaint alleges that Caucasian electricians received more favorable treatment than plaintiff, an African American, because they were allowed 18 months to two years to obtain their journeyman electrician's licenses. Am. Compl. ¶ 25. Nevertheless, he faults DC Water for proceeding as if "the only employees similarly-situated to [plaintiff] are Electrical Equipment Repairer 11 employees." Pl.'s Opp'n at 2; *see id*. at 7. Plaintiff contends that the "job title is not dispositive to the identification of similarly-situated employees." *Id*. at 2. According to plaintiff, there are other similarly-situated employees who "received more time to obtain their licenses and were . . . allowed to return to school," *id*., but these employees in "other units," *id*. at 3, cannot be identified without discovery, *see id*. at 2, 8.

Notwithstanding his argument for discovery, plaintiff refers to the MOA, *see id*. at 3, particularly its third paragraph regarding "Utility Systems Operator RW-08 [employees] hired into the position of a Utility Systems Operator I or II," who were allowed 18 months to obtain necessary certification for that position, *id*., Ex. B (MOA) ¶ 3. Plaintiff fails, however, to describe a Utility Systems Operator's job duties or set forth any basis from which the Court might determine whether and to what extent Utility Systems Operators' situation mirrored plaintiff's situation. Further, plaintiff offers no response to DC Water's assertions that "[t]hese employees are not electricians," Def.'s Reply Mem. of P. & A in Support of its Mot. for Summ. J., ECF No. 23 ("Def.'s Reply") at 20; *see id*., Decl. of Roger E. Brown, Jr., Ex. B (Job

Description, Utility Systems Operator 08), and that "their job duties and supervisory structures differ from either the Electrical Equipment Repairer 11 or Industrial Journeyman Electrician positions," *id*. at 20.

The Court may allow a nonmovant time to take discovery if he "shows by affidavit or declaration that, for specified reasons, [he] cannot present facts essential to justify [his] position." Fed. R. Civ. P. 56(d). The declaration must "outline the particular facts he intends to discover and describe why those facts are necessary to the litigation," explain why he could not produce these facts in his opposition to the summary judgment motion, and demonstrate that the information he seeks is actually discoverable. *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99-100 (D.C. Cir. 2012) (citations omitted). The declaration of plaintiff's counsel is deficient. For example, counsel requests information about the reorganization generally, and about electricians specifically. *See* Decl. Pursuant to Rule 56(d) of the Fed. R. Civ. P. in Support of Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 21-2 ¶¶ 1-5. Missing from his declaration is an outline of the particular facts he intends to discover and why these yet-to-be discovered facts are necessary. If Utility Systems Operators are the similarly-situated employees plaintiff deems comparators, these employees are not even mentioned in the list of matters about which plaintiff claims discovery is needed.[8]

Utility Systems Operators are not electricians, and nothing in the record of this case demonstrates that these non-electricians are viable comparators. Furthermore, in the context of

---

[8] Nor does counsel explain why he could not produce items such as plaintiff's medical records, documents relating to plaintiff's ability to manage his own affairs, and requests for accommodations for plaintiff's alleged disability. *See* Decl. Pursuant to Rule 56(d) of the Fed. R. Civ. P. in Support of Pl.'s Opp'n to Def.'s Mot. for Summ. J. ¶¶ 7-9. These matters are discoverable (even if DC Water is unlikely to have information such as plaintiff's medical records, for example), within the realm of plaintiff's personal knowledge, or otherwise accessible to plaintiff absent formal discovery.

this case, plaintiff does not demonstrate that African American electricians were disadvantaged in any way. There is but one Caucasian electrician in plaintiff's situation -- he was offered the same training opportunity plaintiff was offered, and he obtained a journeyman electrician's license by the March 31, 2015 deadline. Arguably, DC Water treated plaintiff and two fellow African American electricians *more* favorably by allowing them two additional months, to May 31, 2015, to obtain the required journeyman electrician's license.

Next, plaintiff argues that DC Water changed his position description because there had been a change in District of Columbia law. *See* Pl.'s Opp'n at 5-6. "The clause governing the limitation of those who hold an apprentice [electrician's] license ha[s] not changed since at least 1981." *Id*. at 6. Thus, for his entire tenure at DC Water, plaintiff "worked under the supervision of an Electrical Foreman, not a Master Electrician," such that DC Water had "been breaking D.C. statutory law" for decades. *Id*. According to plaintiff, these circumstances "suggest[] that [DC Water's] purported justification for the change of [plaintiff's] position is false and pretext for unlawful discrimination." *Id*.

DC Water does not argue that there had been a change in law regarding electrician's licenses. Rather, it explains, in order "[t]o come into compliance with applicable regulations *already on the books*, DC Water abolished the Electrical Equipment Repairer 11 position" and created the Industrial Journeyman Electrician in its place. Def.'s Reply at 16 (emphasis in original); *see* Sweeney Decl. ¶¶ 8-12. An "Industrial Journeyman Electrician . . . would perform similar duties, but had a job description which explicitly required a journeyman electrician's license. Def.'s Reply at 16. "The tasks and duties [plaintiff] performed, and perhaps should not have [performed], were a critical basis for the change in licensure requirements." *Id*. at 17.

Plaintiff misreads DC Water's argument, and he fails to rebut DC Water's showing based on his misunderstanding of DC Water's proffered basis for its employment decision.

The Court finds that plaintiff has not produced sufficient evidence from which a reasonable jury could find that DC Water intentionally discriminated against him on the basis of race. Discovery is not warranted, and the Court will grant summary judgment in DC Water's favor on Count III.

*E. DCHRA Claims (Count V)*

In the District of Columbia, it is unlawful for an employer "[t]o or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion; or to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee" on the basis of his race, age, or disability. D.C. Code § 2-1402.11(a). A plaintiff making a claim under the DCHRA must do so "within 1 year of the occurrence of the unlawful discriminatory practice, or the discovery thereof." D.C. Code § 2-1403.04(a). However, a timely filed charge with the EEOC, "which in turn cross-files with DCHRA, tolls the time for filing a private cause of action under D.C. law." *Esteños v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 882 (D.C. 2008); *see Ellis v. Georgetown Univ. Hosp.*, 631 F. Supp. 2d 71, 78 (D.D.C. 2009) ("When a charge of discrimination is filed with the EEOC in the District of Columbia, a claim is automatically cross-filed with the D.C. Office of Human Rights . . . pursuant to a 'worksharing agreement' between the two agencies.").

DC Water argues that plaintiff failed to bring his race, age and disability discrimination claims under the DCHRA within the one-year limitations period. Def.'s Mem. at 15-17. Even if

the cross-filing of his EEOC charge with the DCHRA tolled the limitations period, "the tolling period is only one-day long." *Id*. at 16. The Court concurs.

Plaintiff filed his charge of discrimination with the EEOC on May 26, 2015, and the EEOC issued its notice of right to sue one day later, on May 27, 2015. The limitations period would have been "tolled during the processing of the [charge] by the EEOC." *Miller v. Gray*, 52 F. Supp. 3d 62, 68 (D.D.C. 2014) (citations omitted); *see Alexander v. Washington Metro. Area Transit Auth.*, 826 F.3d 544, 551 (D.C. Cir. 2016) (noting that, "generally when a federal court borrows a limitations period from state law, that law's tolling provisions come along as part of the package"). Tolling "ended when the EEOC issued its right to sue notice[.]" *Hammel v. Marsh USA Inc*., 79 F. Supp. 3d 234, 241 (D.D.C. 2015).

The filing of this lawsuit on September 29, 2016 occurred roughly four months after the DCHRA's one-year limitations period expired. The Court has considered and rejected plaintiff's assertion that he was *non compos mentis* during the relevant time period, and absent any alternative basis for tolling the statute of limitations, plaintiff's DCHRA claims are time-barred. The Court grants summary judgment in DC Water's favor on Count V.

### F. Contract Claim (Count VI)

Plaintiff claims to have been employed by DC Water "though an express or implied employment contract" created by the "employee handbook[.]" Am. Compl. ¶ 36. He alleges that DC Water breached the contract "by changing [plaintiff's] job description[,] giving [him] less time than other electricians to obtain his [journeyman electrician's] license," and by denying him "the right to rehire and severance pay provided to other employees." *Id*. DC Water asserts, and plaintiff does not dispute, that "the only express contract that could be at issue is the CBA." Def.'s Reply at 21; *see* Def.'s Mem. at 23; *see also* Pl.'s Opp'n at 13.

### 1. Res Judicata (Claim Preclusion)

DC Water notes that the CBA governs plaintiff's employment terms and conditions, and its "grievance process . . . is the sole and exclusive remedy . . . a covered employee may use to seek recovery for a purported breach of the CBA." Def.'s Mem. at 23. Assuming that plaintiff actually has a viable breach of contract claim, DC Water contends that it "is based on [an] argument that [it] breached the CBA when it changed his job description and job requirements during the reorganization." *Id.* According to DC Water, "[t]hese exact issues were arbitrated . . . through the CBA's sole and exclusive grievance procedure, and the ruling in DC Water's favor has preclusive effect" on plaintiff's contract claim. *Id.*

"The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). Claim preclusion bars a subsequent lawsuit "if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006) (citations omitted); *see New Hampshire v. Maine*, 532 U.S. 742, 748 (2001) ("Claim preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.").

DC Water argues, and the Court concurs, that three elements are easily met. A binding arbitration decision is a final decision on the merits, *see Century Int'l Arms, Ltd. v. Fed. State Unitary Enter. State Corp. "Rosvoorouzheinie,"* 172 F. Supp. 2d 79, 95 (D.D.C. 2001) ("The decisions of binding arbitration proceedings are final decisions on the merits for purposes of res judicata.") (citations omitted), and a union member is in privity with his union, *see Proctor v.*

*District of Columbia*, 74 F. Supp. 3d 436, 452 (D.D.C. 2014), for claim preclusion purposes. Although the Arbitrator is not a court, there is no dispute that plaintiff is a Union member whose employment terms and conditions are governed by the CBA, particularly its provision that arbitration decisions are final and binding decisions on the merits. *Cf. Camp v. Kollen*, 567 F. Supp. 2d 170, 173 (D.D.C. 2008) (rejecting argument that arbitrator's award "is not a final judgment deserving preclusive effect because the award is unconfirmed" where "the parties agreed to participate in binding arbitration, the [arbitrator] rendered a 'final and binding' decision on the merits, and neither party has challenged that decision"). Remaining, then, is a determination whether the Union grievance and plaintiff's contract claim involve the same claims or causes of action.

Two claims need not be "literally identical claims for res judicata to apply." *Capitol Hill Grp. v. Pillsbury Winthrop Shaw Pittman, LLP*, 574 F. Supp. 2d 143, 149 (D.D.C. 2008), *aff'd sub nom. Capitol Hill Grp. v. Pillsbury, Winthrop, Shaw, Pittman, LLC*, 569 F.3d 485 (D.C. Cir. 2009). "Whether two cases implicate the same cause of action turns on whether they share the same 'nucleus of facts.'" *Drake v. FAA*, 291 F.3d 59, 66 (D.C. Cir. 2002) (quoting *Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984)).

Plaintiff's contract claim arose from DC Water's reorganization: DC Water changed plaintiff's job description, negotiated a deadline by which he was to obtain a journeyman electrician's license, and provided training for him and the other Electrical Equipment Repairer 11 employees to prepare for the journeyman electrician's license examination. The Union could have, and opted not to, grieve the change of job description. An Arbitrator addressed the deadline and training matters in the context of the Union grievance, and resolved both matters in

DC Water's favor.  Pursuant to the CBA, the Arbitrator's decision is binding on all parties, including plaintiff.

Plaintiff maintains that the Union's "case is very different from [his] allegations."  Pl.'s Opp'n at 14.  While the Union had heard rumors of a reorganization long before 2014 and had been consulted during the process, plaintiff "faced an abrupt change in his job description" after having worked for DC water for 27 years.  *Id.*  He asserts that the Union's grievance "is not sufficient to address [his] claim" that DC Water "effectively terminated [him] from his position when [it] changed the job description."  *Id.*  Plaintiff does not explain how or why the Union-initiated grievance would have arisen from a set of facts distinct from those supporting his contract claim, or why he might avoid the consequences of binding arbitration.

## 2. Right to Rehire and Severance Pay

In vague terms, plaintiff alleges that "DC Water's employee handbook created a . . . contract" and breached the contract when it "denied [him] the right to rehire and severance pay provided to other employees."  Am. Compl. ¶ 36.  DC Water moves to dismiss this claim on the ground that the pleading fails to state a contract claim upon which relief can be granted.  *See generally* Def.'s Mem. at 26-29.

A plaintiff adequately alleges a breach of contract claim by stating that there is a legitimate contract between the parties, that a party breached an obligation or duty arising from the contract, and that he suffered damages as a result of the breach.  *See, e.g., Logan v. Lasalle Bank Nat'l Ass'n*, 80 A.3d 1014, 1024 (D.C. 2013) (citation omitted); *Patriot, Inc. v. U.S. Dep't of Housing & Urban Dev.*, 963 F. Supp. 1, 6 (D.D.C. 1997) (rejecting implied contract claim where "plaintiffs have not demonstrated an offer, acceptance, or consideration – all essential elements of a contract which are required to succeed on an implied contract claim").

As DC Water notes, *see* Def.'s Mem. at 27-28, the Amended Complaint addresses none of these points.  Plaintiff neither identifies a policy in an employee handbook which DC Water breached, *see id.*, nor alleged the manner by which DC Water breached his purported right to rehire or for severance pay, *id.* at 28.  Further, on summary judgment, plaintiff's opposition fails to produce sufficient evidence to raise a genuine issue of material fact as to the existence, terms and breach of an implied contract.  *See* Def.'s Reply at 23-24.  Therefore, the Court grants summary judgment for DC Water on Count VI.

## III. CONCLUSION

DC Water has demonstrated that there is no genuine issue of material fact in dispute and that it is entitled to judgment as a matter of law.  Plaintiff's ADA and DCHRA claims are time-barred.  Plaintiff failed to exhaust administrative remedies with respect to his ADEA and Title VII claims.  He has not produced sufficient evidence from which a reasonable jury could find that DC Water intentionally discriminated against him on the basis of race, and his lack of success on this Section 1981 claim renders moot his request for discovery.  Lastly, plaintiff fails to state a breach of contract claim.  Accordingly, the Court grants DC Water's motion for summary judgment.  An Order is issued separately.

DATE: September 22, 2017            /s/
                                    COLLEEN KOLLAR-KOTELLY
                                    United States District Judge